UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CASE NO.: 1:18-CR-46-HAB |
| ) | |
| VIRGIL SMITH ) | |

**OPINION AND ORDER**

The Government indicted Defendant, Virgil Smith ("Smith"), on two charges that he distributed methamphetamine, one charge of possession with intent to distribute methamphetamine, and a charge that he possessed a firearm in furtherance of that drug trafficking crime. He is also charged with being a felon in possession of a firearm. (ECF No. 50). This matter is before the Court on the Defendant's Motion to Suppress Evidence (ECF No. 61) filed on December 10, 2019. The Defendant requests that the Court suppress all evidence obtained from the April 10, 2018, warrantless search of Defendant's apartment.

On March 5, 2020, the Court held an evidentiary hearing on the motion. After the filing of the transcript from that hearing, the parties completed briefing on the motion on June 24, 2020. For the following reasons, the Court will DENY the Defendant's Motion to Suppress.

**FACTUAL BACKGROUND**

On April 10, 2018, agents arrested Smith at the Fort Wayne federal building on drug charges. (Tr. of Evidentiary Hr'g at 7–8, ECF No. 72). Smith was on supervised release at the time of his arrest, and in both his contacts with probation and in his post-arrest interview, he had identified his residence as an apartment on Fairfield Avenue where he was living with his girlfriend, Kim Sanders ("Sanders"). (*Id.* at 54-56). Sanders was the leaseholder of the apartment and had been living at the apartment with her elderly mother for approximately eight years. (Tr. at

1

12–13, 28). Smith moved into the apartment in August 2017. (*Id.* at 12, 29). At the time he moved in, Sanders was aware that Smith was on federal supervision and acknowledged that Smith's probation officer had been to the apartment on multiple occasions. (*Id.* at 12, 31).

Shortly after Smith's arrest, Special Agent Tyler Ludwig ("SA Ludwig"), Task Force Officers Darrin Strayer ("TFO Strayer") and Roy Stuckey ("TFO Stuckey"), and a uniformed police officer[1] were tasked with conducting a "knock and talk" with Sanders at her apartment located at 6440 Fairfield Avenue. (*Id.* 7–8). They also were seeking consent to search her apartment. (*Id.*).

Once at the apartment, the officers knocked on the door to the apartment and Sanders answered. The TFOs identified themselves to Sanders using their FBI credentials. (Tr. at 8–9). Sanders invited the agents into her apartment and was "extremely cooperative." (Tr. at 9). The agents explained that Smith had been arrested earlier in the morning on drug-related charges and that they sought her consent to search her apartment, "to assure there was no contraband, including drugs or firearms, in the apartment related to Smith." (*Id.* at 9). Sanders provided the officers verbal consent to search the apartment as she had nothing to hide. (*Id.* at 9, 39).

SA Ludwig also presented an FBI consent form to Sanders which sought "a complete search of" her apartment. (Tr. at 27, Gov't Ex. 1). The form confirmed that Sanders had been "advised of [her] right to refuse consent" and that Sanders' permission was voluntary. By virtue of signing the form, Sanders further authorized the agents "to take any items which they determine may be related to their investigation." (*Id.*). SA Ludwig read the form to Sanders and throughout the course of reading the form to her paused to ensure that she acknowledged that she understood its terms. SA Ludwig then requested Sanders to read the form herself and sign the form. Sanders

---

[1] The agents were dressed in khaki pants or jeans and button-down shirts (Tr. at 8), and their firearms were not exposed to view (Tr. at 14).

signed the form and both SA Ludwig and TFO Strayer signed as witnesses. (Gov't Ex. 1; Tr. at 11–12, 36). Sanders placed no limitations on the agents in conducting their search. (Tr. 13, 57).

Once Sanders signed the consent to search, the agents began their search. (Tr. 15). Sanders watched the search while it was in progress. (*Id.*) TFO Stuckey searched the kitchen, including cabinets, drawers, the refrigerator and open food containers. (Tr. 47–48). He then moved to the living room where he opened and searched the compartments of the ottoman footstools. During that search, TFO Stuckey located a scale and methamphetamine in one of the ottomans. (Tr. 48-51; Gov't Exs. 6–8).

Meanwhile, SA Ludwig searched the bedroom where Sanders' mother slept. Under some clothes in the closet, he located a backpack with a Cricket Wireless logo. Upon further investigation of the backpack, SA Ludwig located a .44 silver Magnum handgun, a black holster, a spare speed loader for a .44 Magnum handgun and extra .44 Magnum ammunition inside it. (Tr. 14–15). After finding these items, the agents showed them to Sanders. Sanders told the agents that they were not hers and she "seemed visibly upset that those items were located in her apartment." (Tr. 16).

Sanders testified that she purchased the ottomans prior to Smith moving into her apartment. (Tr. 32). She stated that there were no areas of the apartment that she did not have access to or considered "only" to be Smith's areas. (*Id.* at 33: "I had access to everything."). Sanders testified that she used the ottomans for storage at times, including toys, but for "nothing significant." (Tr. 35). As for the backpack, Sanders testified that her ex-husband lived with her prior to Smith moving in with her in August 2017. She further indicated that the backpack "may" have been her ex-husband's as he had an account with Cricket wireless (Tr. 33, 41); he may have given it to her

3

(Tr. 33); or, it may have been a bag of hers because she "has a lot of bags." (Tr. 34). She testified that she had never seen Smith with that bag. (Tr. 42).

With respect to the officers' demeanor, Sanders testified that they were polite, professional, and she was not afraid of them in any way. (Tr. 36). She testified that she voluntarily provided consent to search and voluntarily signed the consent form. She was not under the influence of any substances or alcohol at the time she gave consent.

Based on the above facts, Defendant's Motion to Suppress seeks suppression of the evidence seized during this warrantless search. Specifically, Defendant wishes to suppress the gun located in the Cricket backpack and the scale and methamphetamine found in the bottom of one of the ottoman compartments.

## **DISCUSSION**

In their briefing, the parties have pared the issue before the Court to the discrete question of whether Sanders' actual authority to search the apartment extends to all containers within the apartment. The Government and Smith are in agreement that Sanders had actual authority to consent to the general search of the apartment (ECF No. 75 at 1), but disagree about whether her authority extended to the search of the ottomans and backpack found during the general search and, hence, whether it yielded admissible evidence. Smith asserts that simply because a third party has authority to consent to a search of a general area, that authority does not automatically encompass every enclosed space, compartment or personal item within that area. (ECF No. 75 at 2). For the reasons below, the Court concludes that under the facts in this case, it does.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment generally prohibits law enforcement

4

officers from conducting a warrantless search or seizure of a defendant's residence or property, subject to a few well-recognized exceptions. *See id.*; *United States v. Place*, 462 U.S. 696, 701 (1983) ("seizure of personal property [is] *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant"). One of those Fourth Amendment exceptions occurs when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant. *United States v. Matlock,* 415 U.S. 164 (1974). Whether a person has common authority is based on "mutual use of the property by persons generally having joint access or control …" *Id.* at 171 n.7. The Government bears the burden of proving that the person giving consent had the required common authority to do so. *United States v Denberg,* 212 F.3d 987, 991 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).

There is no question but that the Government has met its initial burden here. Even the Defendant concedes that Sanders had authority to consent to the generalized search of the apartment. Smith does not concede, however, that the scope of the search was proper. Rather, he asserts that Sanders' general consent did not permit the agents to rummage through the backpack or open the ottomans.

"The scope of consent is 'limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances.'" *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005), quoting *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003). "As the Supreme Court has explained, the 'scope of a search is generally defined by its expressed object.'" *United States v. Thurman*, 889 F.3d 356, 368 (7th Cir. 2018), quoting *Florida v. Jimeno*, 500 U.S. 248, 251(1991). From there, it flows that "[g]enerally, consent to search a space includes consent to search

containers within that space where a reasonable officer would construe the consent to extend to the container." *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000), citing *Jimeno*, 500 U.S. at 251;*Wyoming v. Houghton*, 526 U.S. 295, 302 (1999), and *United States v. Ross*, 456 U.S. 798 (1982).

In this case, Sanders gave consent to search without limitations. The consent form she signed authorized a "complete" search of the residence. She testified that she had full access to all the areas in the apartment and that there were no areas that specifically "belonged" to Smith. From all this, the officers could reasonably understand Sanders' unlimited consent to apply to the entirety of the residence and any container that might contain drugs or guns, the very objects of the search. Moreover, Sanders was present during the search and did not, at any point, limit the scope of the officers' search. Nonetheless, Smith argues that closed containers that normally hold highly personal items require something additional from the officers before they are permitted to search them. (ECF No. 75 at 2).

The Seventh Circuit's holding in *Melgar* is particularly relevant and on point here. In that case, officers searched a purse found in a hotel room where consent was given by a third-party. *Melgar,* 227 F.3d at 1041. Melgar, while acknowledging that the third-party had actual authority for a general search, asserted that under Seventh Circuit precedent an exception existed for "closed containers that the police have no reason to believe are under the control of the person who agreed to the search." *Id.*; see *United States v. Rodriguez,* 888 F.2d 519 (7th Cir. 1989) (reasoning that consent to search premises cannot always extend to every closed container within them, because such a rule would imply consent to search the United Airlines baggage facility at O'Hare airport would justify searching everyone's luggage).

6

The Seventh Circuit rejected Melgar's argument and validated the search determining that the police had no reason to know that the purse did not belong to the person granting consent. In reaching this conclusion, the Court wrote:

> [T]he real question for closed container searches is which way the risk of uncertainty should run. Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search ... or is it permissible if the police do not have reliable information that the container is *not* under the authorizer's control. We are not aware of any case that has taken the strict view represented by the first of these possibilities…
>
> A contrary rule would impose an impossible burden on the police. It would mean that they could never search closed containers within a dwelling ... without asking the person whose consent is being given *ex ante* about every item they might encounter.

*Melgar,* 227 F.3d at 1042 (emphasis in original). Thus, the Seventh Circuit concluded that absent a reason for police to believe that the third-party could not consent to the search of the purse, the third-party consent to a "complete search of Room 136 did not violate the Fourth Amendment…" *Id.* at 1042.

The Court concludes that *Melgar* is determinative here. Once the officers had obtained the valid consent to search the apartment, the consent is reasonably understood to extend to containers "if the police do not have reliable information that the container is not under the authorizer's control." *Melgar,* 227 F.3d at 1042; *see also*, *United States v. Wilburn*, No. 04-CR-80, 2005 WL 8162701 (E.D.Wis. July 13, 2005)(relying on *Melgar* to uphold the search of a closed black duffle bag found inside apartment where police had no reason to believe the consenting party did not have actual or apparent authority to consent). The officers did not have any reliable information that Sanders could not consent to the opening of the ottomans and the backpack and, for this reason, the motion to suppress fails.

Smith cites to *Krise v. State*, 746 N.E.2d 957 (Ind. 2001), an Indiana Supreme Court decision decided shortly after *Melgar* that seemingly yields the opposite result. There, a man and woman jointly occupied a house and the man consented to a search of the premises for drugs. *Id.* at 959–60. Officers found a woman's purse in the bathroom, searched it, and found a leather pouch containing a small wooden case which in turn contained marijuana and methamphetamine. *Id.* at 960. The court concluded that because the man and woman shared the home, the man could consent to search of the common areas of the house, including the bathroom. *Id.* at 967. However, it held that the man could not consent to the search of the purse because "inspection of closed containers that normally hold highly personal items requires the consent of the owner or a third party who has authority—actual or apparent—to give consent to the search of the container itself." *Id.* at 969.

Smith asserts that *Krise* mandates that the items found in the ottoman and the backpack be suppressed because these containers hold highly personal items for which Sanders did not have the authority to consent. This Court disagrees.

First, *Krise* is not binding precedent in this Court and has, at best, persuasive value in the absence of guidance from the Seventh Circuit. "[D]istrict court judges are not free to disregard the law as clearly espoused by the Seventh Circuit, until it is either overruled by that court or the Supreme Court. *Szany v. Garcia*, No. 2:17-CV-74-PPS-JPK, 2020 WL 2767356, at *15 (N.D. Ind. May 28, 2020); *Shebley v. United Cont'l Holdings, Inc.*, No. 17-CV-01906, 2020 WL 2836796, at *6 (N.D. Ill. May 31, 2020) ("[I]t is the Seventh Circuit's precedents that are binding on this Court, not decisions from district courts or other courts of appeals.")

Second, even if the Court was inclined to consider the ruling, the Indiana Supreme Court has refined *Krise* and that fine-tuning soundly dooms Smith's cause. See *Lee v. State*, 849 N.E.2d. 602 (Ind. 2006). In *Lee,* the defendant's fiancée consented to the viewing of VHS tapes containing

8

illegal acts which she found in their jointly occupied home and took to the police station. Defendant argued that *Krise*'s holding applied to the tapes – asserting that he had a protected privacy interest in the tapes[2] similar to the private personal items contained in a purse and thus, the consent provided by the fiancée to view the tapes violated the Fourth Amendment. The Court flatly rejected this argument determining that "by living with Melissa and taking no steps to deny Melissa access to the tapes, David assumed the risk that Melissa would take the tapes to the police station." *Lee*, 849 F.2d at 607. Before reaching that conclusion, the Court discussed the holding in *Krise*:

> The mere fact that an object might be characterized as a 'container' because it conceals its contents from view does not compel the conclusion that the 'container' cannot be opened by another occupant. The relevant question is whether co-occupants exercise joint control and mutual use of the object for most purposes such that any occupant could permit inspection 'in his own right.' If so, the nonconsenting occupant assumed the risk of such inspection. A co-occupant may deny joint access over an object by keeping it in a place devoted to the owner's exclusive use or where the object is one over which only one person normally exercises control and authority or which 'normally hold[s] highly personal items.' Similarly, a nonconsenting co-occupant may take steps to deny access to co-occupants to a designated area or object. But in the absence of any such steps, a co-occupant may have mutual use and joint access to many items in the premises.

*Lee*, 849 N.E.2d at 608 (internal citations omitted). Thus, the Court concluded that *Krise* did not extend to the content of the VHS tapes because the co-occupant was not denied joint access and thus, could permit inspection "in her own right." *Id.*

Smith points to absolutely nothing in the record that raises even a remote question that Sanders did not exercise joint access over the ottomans in her own living room. She testified she bought them, she used them for storage (albeit not regularly) and they were located in common space within the apartment. Likewise, Sanders testified that there were no designated areas or objects within the home to which she was denied access by Smith. Similarly, Smith has disavowed that the backpack in the closet belonged to him and there is no evidence that whomever the

---

[2] The Court assumed without deciding that the tapes constituted a "container."

backpack belonged to intended to exclude the house occupants from opening it. Rather, the opposite is true – the owner assumed the risk of it being opened by the apartment's occupants by virtue of its location in an unsecured location.

Simply stated, regardless of whether the Court applies the binding precedent in *Melgar* or the persuasive guidance in *Krise* (as clarified in *Lee*), Smith does not succeed in his quest to have the search of the ottomans or the backpack suppressed. The officers had no reasonable belief that Sanders did not have the ability to consent to the opening of the ottomans located in the common living areas or the unsecured backpack located in the floor of a closet over which she had common authority. *See Melgar*, 227 F.3d at 1041. Nor has Smith demonstrated that Sanders' could not consent "in her own right" to the search of these containers, which she could have opened unencumbered on her own at any time. *See Lee*, 849 F.2d at 606. Accordingly, the Motion to Suppress is DENIED.

## **CONCLUSION**

Based on the foregoing, the Defendant's Motion to Suppress (ECF No. 61) is DENIED. !
So ORDERED on July 9, 2020.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT
